## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**CENTER FOR BIO-ETHICAL REFORM, INC.; GREGG CUNNINGHAM**; and **KEVIN MURRAY,**

Plaintiffs,

v.

**JANET NAPOLITANO**, in her official capacity as Secretary of the Department of Homeland Security; and **ERIC H. HOLDER, JR.**, in his official capacity as Attorney General of the United States,

Defendants.

No. 5:09-cv-11441-JCO-RSW

**FIRST AMENDED COMPLAINT**

Hon. John Corbett O'Meara

THOMAS MORE LAW CENTER
Robert J. Muise, Esq. (P62849)
Richard Thompson, Esq. (P21410)
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
rmuise@thomasmore.org
(734) 827-2001
*Counsel for Plaintiffs*

---

Plaintiffs Center for Bio-Ethical Reform, Inc., Gregg Cunningham, and Kevin Murray, by and through their undersigned counsel, bring this First Amended Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following upon information and belief:

### INTRODUCTION

1. This case seeks to protect and vindicate fundamental constitutional rights. It is a civil rights action brought under the First and Fifth Amendments to the United States

1

Constitution, challenging the policy, practice, procedure, and/or custom of Defendants that targets for disfavored treatment those individuals and groups that Defendants deem to be "rightwing extremists" (hereinafter RWE Policy).

2. The RWE Policy was created, adopted, implemented, and enforced through a partnership with private organizations that are political adversaries of Plaintiffs.

3. The existence of the RWE Policy was recently and publicly confirmed by the Department of Homeland Security in an assessment entitled, "Rightwing Extremism: Current Economic and Political Climate Fueling Resurgence in Radicalization and Recruitment."

4. Defendants' policy of targeting certain individuals and groups, including Plaintiffs, for disfavored treatment based on their viewpoint on controversial political issues creates harm to Plaintiffs and those who associate with them in violation of the First and Fifth Amendments. This harm is furthered by the partnership that was forged between Defendants and certain private organizations to create, adopt, implement, and enforce the RWE Policy.

5. Plaintiffs seek a declaration that through the creation, adoption, implementation, and enforcement of the RWE Policy, Defendants have violated Plaintiffs' clearly established constitutional rights as set forth in this First Amended Complaint; a declaration that the RWE Policy infringes upon the right to engage in controversial political speech in violation of the First Amendment; a declaration that the RWE Policy infringes upon the freedom of expressive association in violation of the First Amendment; a declaration that the RWE Policy violates the equal protection guarantee of the Fifth Amendment by targeting certain individuals and groups for disfavored treatment based on the viewpoint of their speech; a permanent injunction enjoining the RWE Policy and its application to Plaintiffs' speech and activities; an order

directing the disclosure of any files or databases containing information about Plaintiffs or Plaintiffs' activities as set forth in this First Amended Complaint; a permanent injunction enjoining the creation or maintenance of files or databases containing information about Plaintiffs or Plaintiffs' activities as set forth in this First Amended Complaint; a permanent injunction enjoining the disclosure of information or data about Plaintiffs or Plaintiffs' activities to private organizations as set forth in this First Amended Complaint; and an award of attorney fees and costs pursuant to 28 U.S.C. § 2412 (the Equal Access to Justice Act), and other applicable laws.

### JURISDICTION AND VENUE

6. This action in which the United States is a defendant arises under the Constitution and laws of the United States. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1346.

7. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

8. Venue is proper under 28 U.S.C. § 1391(e) because this is the judicial district in which Plaintiff Kevin Murray resides.

### PLAINTIFFS

9. Plaintiff Center for Bio-Ethical Reform, Inc. (CBR), is a pro-life, non-profit corporation that is recognized by the Internal Revenue Service (IRS) as a 501(c)(3) organization. It is incorporated under the laws of California. CBR engages in its anti-abortion activities throughout the United States, including Michigan.

10.     Plaintiff Gregg Cunningham is an adult citizen of the United States and the Executive Director of CBR.

11.     Plaintiff Kevin Murray is an adult citizen of the United States and a resident of Washtenaw County, Michigan.  He is a former U.S. Marine who served honorably in the war in Iraq.

**DEFENDANTS**

12.     Defendant Janet Napolitano is the Secretary of the Department of Homeland Security ("DHS").  As the head of DHS, she is responsible for creating, adopting, implementing, and enforcing the RWE policy.  Defendant Napolitano is also responsible for the policies, practices, procedures, customs, and actions of the Office of Intelligence and Analysis, the Extremism and Radicalization Branch of the Homeland Environment Threat Analysis Division, and the Federal Emergency Management Agency (FEMA).  In her capacity as Secretary of DHS, Defendant Napolitano is responsible for creating and operating "fusion centers," which are local intelligence centers that were established across the United States to conduct surveillance, gather information, and combat "terrorism" and related "criminal" activity.  Defendant Napolitano is sued in her official capacity.

13.     Defendant Eric H. Holder, Jr. is the Attorney General of the United States.  As the Attorney General, he is the head of the Department of Justice and the chief law enforcement officer of the federal government.  Accordingly, he is charged with implementing and enforcing the RWE Policy.  Defendant Holder is sued in his official capacity.

## STATEMENT OF FACTS

**A.      RWE Policy.**

14.      On April 7, 2009, the Office of Intelligence and Analysis issued an assessment that was prepared by the Extremism and Radicalization Branch of the Homeland Environment Threat Analysis Division.   This assessment was coordinated with the Federal Bureau of Investigation (FBI) and with certain private organizations that are political adversaries of Plaintiffs.

15.      The assessment was entitled, "Rightwing Extremism: Current Economic and Political Climate Fueling Resurgence in Radicalization and Recruitment" (hereinafter DHS Assessment).

16.      The DHS Assessment is part of the RWE Policy, and it confirmed the existence of the policy.

17.      The DHS Assessment was created to provide state and federal law enforcement with a basis and justification to conduct investigative and other law enforcement actions against those deemed to be "rightwing extremists."

18.      The RWE Policy directs state and federal law enforcement to conduct investigative and other law enforcement actions against those deemed to be "rightwing extremists."

19.      Pursuant to the RWE Policy, Defendants have placed the force of federal and local criminal enforcement powers behind the label of "rightwing extremists," which is broadly applied and construed to include Plaintiffs and those that associate with them.

20. According to Defendants and pursuant to the DHS Assessment and the RWE Policy, rightwing extremists include those groups and individuals that are antigovernment, that reject federal authority in favor of state or local authority, or that reject government authority entirely. Rightwing extremists also include those groups and individuals that are dedicated to a single issue, such as opposition to abortion, immigration, same-sex "marriage," and gun control. According to the RWE Policy, Plaintiffs are "rightwing extremists."

21. As stated in the DHS Assessment, the assessment "contains Law Enforcement Sensitive (LES) information. No portion of the LES information should be released to the media, the general public, or over non-secure Internet servers. Release of this information could adversely affect or jeopardize investigative activities."

22. The DHS Assessment was "leaked" to the public approximately one week prior to the TEA (Taxed Enough Already) parties that were scheduled to be held across the country on April 15, 2009. TEA parties are peaceful public protests to the expansion of the federal government and federal spending programs under the current administration and the increase in taxes that will be required to fund them.

23. The public release of the DHS Assessment had the intended and calculated effect of deterring people from supporting or associating with organizations and groups that Defendants declared to be "rightwing extremists."

24. The public release of the DHS Assessment had the intended and calculated effect of deterring people, such as Plaintiffs and those who associate with them, from participating in events such as the national TEA parties and anti-abortion protests and demonstrations.

25. Shortly after the DHS Assessment was released to the public, Defendant Napolitano publicly approved and supported the assessment.

26. While the DHS Assessment is a public confirmation of the existence of the RWE Policy, the policy itself goes beyond the assessment.

27. According to a current FBI agent, who was speaking anonymously in a published media report, "The Department of Homeland Security Intelligence Assessment that is receiving so much attention is just the tip of the proverbial iceberg, and the true patriotic citizens of this country are on the Titanic. . . . But it goes far beyond that assessment. There have been very significant changes made over the last few years that redirect the focus and assets of the intelligence community internally. These changes have greatly accelerated under this administration, and the threats have been redefined to include those who used to be patriots. . . . The redirection, the refocusing of domestic threats from al Qaeda cells to 'flag waving right-wingers' is something that has gone from a murmur a few years ago to a roar today."

28. Pursuant to the RWE Policy, on or about March 23, 2009, a confidential directive was issued by FBI headquarters in Washington, D.C. to each of its 56 field offices, instructing the Special Agent in Charge (SAC) to verify the date, time, and location of each TEA party within his or her region and to supply that information to FBI headquarters. The directive instructed the field office to obtain and confirm the identity of the individual(s) involved in the actual planning and coordination of the event in its region. The directive was tightly controlled.

29. Pursuant to the RWE Policy, a second directive was issued by FBI headquarters on or about April 6, 2009. This directive instructed each SAC to coordinate and conduct, either at the field office level and/or with the appropriate resident agency, covert video surveillance and

data collection of the participants of the TEA parties. This information was to be submitted to Washington, D.C.

30. As a result of the RWE Policy, there have been significant changes made in the federal government that redirect the focus and assets of the intelligence and law enforcement communities internally.

31. Pursuant to the RWE Policy, local and federal law enforcement agencies and others conduct covert surveillance and collect data on individuals and groups declared to be "rightwing extremists."

32. Pursuant to the RWE Policy, state fusion centers are targeting anti-abortion organizations as potential domestic terrorists, listing organizations with no ties to violence by name in official reports. Some of the reports have been released to the public. In Missouri, for example, an official report from a state fusion center—the Missouri Information Analysis Center (MIAC)—targets anti-abortion groups as potential threats to public safety and specifically warns law enforcement that displaying anti-abortion material may be a sign of a potential threat. The MIAC report relied on information received from the Southern Poverty Law Center.

33. As a result of the RWE Policy, there is an emerging patter of systematic abuse of state and federal law enforcement and intelligence assets to target law-abiding Americans engaged in the peaceful expression of political views. The target groups are not domestic terrorists, but those, such as Plaintiffs, who make known certain opinions on abortion, same-sex "marriage," gun control, illegal immigration, taxation, and other matters of opinion. Their offense is that they disagree with the current administration's policies.

34. In Oklahoma, for example, a Christian man was stopped by a local law enforcement officer for having a sign displayed in his vehicle that read, "Abort Obama Not the Unborn." The sign was confiscated, and the man was later investigated by the federal government.

35. As a result of the RWE Policy, local and federal law enforcement and intelligence agencies and officials have been conducting surveillance on law-abiding American citizens who are deemed to be "rightwing extremists," and taking law enforcement actions against them.

36. As a result of the RWE Policy, local and federal law enforcement and intelligence agencies and officials have been conducting surveillance on public events, such as the national TEA parties and anti-abortion protests and demonstrations.

37. As a result of the DHS Assessment and the RWE Policy, Plaintiffs are now a target of federal and local law enforcement actions.

38. As a result of the DHS Assessment and the RWE Policy, Plaintiffs are officially branded by the federal government as "rightwing extremists."

39. The RWE Policy considers "rightwing extremists" to be dangerous and a threat to national security.

40. By branding political opponents as "rightwing extremists," Defendants seek to officially censor, correct, and/or condemn certain political views and ideas and thereby prescribe what shall be orthodox in politics, nationalism, religion, and other matters of opinion.

41. The RWE Policy is designed to deter, prevent, and preempt activities that government officials deem to be in opposition to certain policies and political positions advanced by the current administration. Such activities are considered harmful, dangerous, and a threat to

national security. By deterring, preventing, and preempting such activities, Defendants seek to influence domestic public opinion in support of the favored policies and positions of the current administration.

42. The RWE Policy is a tool of intimidation for federal, state, and local government officials. It provides a basis for government officials to abuse their positions of power to stifle political opinion and opposition. It also provides political adversaries with a basis for making official complaints and allegations against "rightwing extremists" to government officials, thereby empowering the "heckler" with a "veto" over controversial political messages.

43. Per the DHS Assessment and the RWE Policy, Defendants are focused on "rhetorical" opposition to government policies, "rightwing extremist" chatter on the Internet, "accusatory tactics," and "antagonism" toward the new presidential administration and its perceived stance on a range of controversial political issues, including immigration and citizenship, abortion, and restrictions on firearms ownership and use.

44. Per the RWE Policy, Defendants seek to deter "rightwing extremist" speech activities, which Defendants claim have the potential to incite individuals or small groups toward violence.

45. Pursuant to the RWE Policy, Defendants do not consider a private citizen's right to bear arms to be an individual right protected by the United States Constitution. Accordingly, Defendants seek to place greater restrictions on this right.

46. According to the DHS Assessment and the RWE Policy, debates over controversial political issues have the potential to turn violent, thereby providing a pretext for increasing government surveillance and scrutiny of those deemed to be "rightwing extremists."

47. According to the DHS Assessment and the RWE Policy, ideas and viewpoints expressed in opposition to controversial political issues, such as immigration, gun control, abortion, and same-sex "marriage," are considered dangerous and a threat to national security, thereby providing a pretext for increasing government surveillance and scrutiny of those deemed to be "rightwing extremists."

48. According to the DHS Assessment and the RWE Policy, "disgruntled military veterans" are susceptible to being recruited and radicalized by "rightwing extremists" in order to exploit the veterans' skill and knowledge derived from military training and combat. Consequently, "disgruntled military veterans" are considered dangerous and a threat to national security, thereby providing a pretext for increasing government surveillance and scrutiny of military veterans.

49. The DHS Assessment and the RWE Policy target military veterans, yet the FBI itself reported in July 2008 that just 19 veterans of the war on terrorism became involved in violent extremist movements between 2001 and 2008.

50. According to the DHS Assessment and the RWE Policy, Defendants and other federal officials will work with state, local, tribal, and private organizations to conduct surveillance and to gather and share information in order to deter the activities of those individuals and groups deemed to be "rightwing extremists."

51. Pursuant to the DHS Assessment and the RWE Policy, Defendants encourage the reporting of information concerning "suspicious" or "criminal" activity of "rightwing extremists" to DHS and the FBI.

52. Defendants encourage the reporting of information concerning the activities of "rightwing extremists" pursuant to the RWE Policy in order to deter the activities. Pursuant to the RWE Policy, this information is collected and maintained by Defendants, and it is shared with certain private organizations that are political adversaries of Plaintiffs.

53. To facilitate the implementation and enforcement of the RWE Policy, Defendants and other government officials make use of state and local fusion centers, which are local intelligence centers created by DHS to combat "terrorism" and related activities that are deemed to be "criminal." Defendant Napolitano described these fusion centers as the "centerpiece of state, local, federal intelligence-sharing" in the future.

**B.  Partnership with Private Organizations.**

54. In 2005, Democratic members of the House Committee on Homeland Security issued a report expressing their concern that DHS was not doing more to fight "right-wing domestic terrorists." The report recommended that DHS partner with certain private organizations that have "experience with monitoring right-wing domestic terrorists." These organizations include the Southern Poverty Law Center (SPLC), the National Abortion Federation (NAF), and the Anti-Defamation League (ADL), among others.

55. Consequently, Defendants and other government officials formed a partnership with several private organizations, including SPLC, NAF, and ADL, among others, to create, adopt, revise, implement, and/or enforce the RWE Policy.

56. SPLC, NAF, and ADL hold political views and positions contrary to those expressed and supported by Plaintiffs. They are Plaintiffs' political adversaries.

57.     Defendants and private organizations such as SPLC, NAF, and ADL share and distribute information that is collected and maintained pursuant to the RWE Policy. There are no safeguards for the use or distribution of the information collected pursuant to the policy. Consequently, this information is available to political opponents of Plaintiffs, and it can be used to harm the operations and activities of organizations deemed to be "rightwing extremists," such as CBR.

58.     Private organizations, such as SPLC and ADL, participate in the training of local and federal officials, including law enforcement officials, regarding the implementation and enforcement of the RWE Policy. SPLC and ADL, for example, conduct workshops in which they train hundreds of federal and state law enforcement personnel in the alleged dangers posed by "rightwing" threats.

59.     According to SPLC, its "Intelligence Project regularly conducts in-person training for local, state and federal law enforcement officers by request. [The Intelligence Project staff] focus on the history, background, leaders and activities of far-right extremists in the U.S."

60.     According to SPLC, "Intelligence Project staff have been involved in the Federal Law Enforcement Training Center's hate and bias crime 'train-the-trainer' program since its inception in 1992. FLETC trains personnel for more than 75 federal law enforcement agencies and provides services for local, state and international agencies."

61.     According to SPLC, "FLETC invited Intelligence Project personnel to help develop and write courses for a training program to improve the recognition, reporting and investigating of hate crimes." SPLC Intelligence Project staff "continues to instruct FLETC classes today."

62. SPLC's "Intelligence Project" focuses on "anti-abortion extremists," "hate speech" of rightwing extremists, "extremists in the military," and "anti-Semitism," among others.

63. In 2008, SPLC wrote to the Secretary of Defense and requested that the Department of Defense adopt a "zero-tolerance policy" with respect to extremists in the military.

64. Currently, and not coincidentally, there is a proposal to introduce an amendment to the National Defense Authorization Act (H.R. 2647) that will prevent, *inter alia*, the United States government from recruiting, enlisting, or retaining persons in the armed forces who are associated with a "hate group." According to this proposed legislation, a "hate group" includes "Other groups or organizations that are determined by the Attorney General to be of a violent, extremist nature." According to the proposed legislation, "The following shall constitute evidence that a person is associated or affiliated with a group associated with hate-related violence: . . . (B) Individuals known to have attended meetings, rallies, conferences, or other activities sponsored by a hate group."

65. ADL trains senior level law enforcement personnel from federal and state law enforcement agencies across the country. This includes training on "right-wing extremism," "hate groups," and their trends in the United States. ADL has forged a partnership with federal law enforcement agencies and is called upon to monitor, to prepare reports about, and to track trends of rightwing extremism.

66. ADL is strongly pro-abortion and opposes the activities of individuals and groups that are anti-abortion, describing them as "extremists." ADL opposes groups, such as CBR, that compare abortion to the Holocaust.

14

67. According to ADL, comparing abortion to the Holocaust is anti-Semitic and constitutes "hate speech."

68. SPLC, NAF, and ADL have been actively involved in the creation, adoption, and enforcement of the RWE Policy.

69. Pursuant to the RWE Policy, personal information about "rightwing extremists" is collected by local and federal law enforcement agencies in conjunction with the fusion centers, and that information is maintained in government files and databases, and it is shared with private organizations that support the RWE Policy, such as SPLC, NAF, and ADL.

70. The language used by Defendants in their official reports, including the DHS Assessment, is similar to the language used by certain private organizations, such as SPLC, NAF, and ADL, to vilify their political opponents, such as CBR. This is further evidence of the partnership forged between Defendants and these private organizations and the sharing of information amongst them.

**C.    Plaintiffs CBR and Gregg Cunningham.**

71. CBR was established in 1990 as a non-profit public policy and advocacy group to promote prenatal justice and the right to life for the unborn, the disabled, the infirm, the aged, and all vulnerable peoples through education and the development of innovative educational programs. One such educational program is the Reproductive Choice Campaign (RCC).

72. The RCC consists of large, colorful pictures depicting graphic images of first-term aborted fetuses displayed on the sides of box-body style trucks that are owned by CBR and operated by CBR employees and volunteers. Above each picture is captioned the word "Choice." The purpose of this educational program is to expose as many people as possible to

the reality of "Choice," a term that is at the heart of the abortion controversy. The RCC demonstrates to onlookers that "Choice" is the killing of innocent human life, and not some sterile, innocuous term. CBR employees and volunteers drive these trucks along the streets and highways of major cities and towns throughout the United States, including the streets and highways of major cities and towns in Michigan.

73. Another educational program used by CBR is the Airborne Reproductive Choice Campaign (ARCC). The ARCC consists of large, colorful pictures depicting graphic images of first-term aborted fetuses displayed on banners towed behind aircraft. CBR hires individual pilots or companies that provide aerial advertising to fly CBR's pro-life aerial banners. CBR has flown its banners throughout the United States.

74. CBR also engages in an educational program called the Genocide Awareness Project (GAP), which is a traveling photo-mural exhibit that compares the contemporary genocide of abortion to historically recognized forms of genocide, such as the Holocaust. CBR's GAP display visits university campuses around the country to show as many students as possible what abortion actually does to unborn children and to get them to think about abortion in a broader historical context.

75. CBR strongly opposes the current administration's pro-abortion policies and has instituted an "Obama Awareness Campaign," which juxtaposes images and quotations of President Obama alongside images of aborted fetuses and aborted preborn children. CBR displays these graphic images on the sides of box-body style trucks driven by CBR employees and volunteers and on banners towed by aircraft throughout the United States, including at events in which President Obama is either attending or speaking. True and accurate photographs

of the "Obama Awareness Campaign" images are attached to this First Amended Complaint as Exhibit 1.

76. As a result of the "Obama Awareness Campaign," CBR has become a greater target for law enforcement action under the RWE Policy.

77. According to sources within FEMA, the United States Army, and the White House, a number of violent "right-wing," anti-abortion individuals and groups arrived in South Bend, Indiana in May 2009 to protest President Obama's participation in the commencement ceremony at the University of Notre Dame.

78. FEMA, which is part of DHS, has as its primary mission "to reduce the loss of life and property and protect the Nation from all hazards, including natural disasters, acts of terrorism, and other man-made disasters."

79. CBR was one of the "right-wing" groups that arrived in South Bend, and it deployed its "Obama Awareness Campaign" to protest the president and his policies on abortion.

80. Although there were no reported acts of violence committed during the ceremony, the anti-abortion groups that participated in the protest, such as CBR, were publicly described by federal officials as "right-wing" and "violent."

81. On account of their speech activities, CBR and its employees and volunteers have been the target of surveillance and enforcement actions by federal and local law enforcement officers and agencies. CBR and its employees and volunteers have been detained by agents from the FBI, who described CBR as a domestic terrorist organization on account of CBR's opposition to abortion. The Department of Justice defended the actions of the FBI, claiming that the FBI agents reasonably believed that CBR was involved in domestic terrorism.

82. Similarly, local law enforcement officers and agencies have harassed and detained CBR and its employees and volunteers on account of CBR's speech activity, treating CBR and its employees and volunteers as criminals.

83. CBR has been harassed by the IRS, forcing CBR to hire an expensive lawyer to defend against the threat of a costly audit.

84. CBR's pilots have been harassed by Federal Aviation Administration (FAA) officials, who have at times grounded CBR's aircraft.

85. Pursuant to the RWE Policy, CBR and its Executive Director, employees, and volunteers are "rightwing extremists," subjecting them to increased government scrutiny, investigation, surveillance, and intimidation.

86. The RWE Policy provides federal and local law enforcement officers and agencies with a DHS-sanctioned basis to conduct further harassment of CBR on account of CBR's speech activities and its strong opposition to abortion and the current administration's policies on abortion.

87. As a non-profit organization, CBR relies heavily upon volunteers and on charitable donations from its supporters to conduct and fund its activities. CBR typically attracts a large number of volunteers who are former members of the United States military.

88. The DHS Assessment and RWE Policy have negatively affected CBR's ability to attract volunteers to assist with its anti-abortion speech activities.

89. The DHS Assessment and RWE Policy have negatively affected CBR's reputation, thereby making it difficult to recruit volunteers, to raise money, and to obtain

permission to engage in speech activity at public locations, such as college and university campuses.

90. Plaintiffs CBR and Cunningham, and those who associate with CBR, do not want to be part of a surveillance video or included in surveillance photographs because of their First Amendment speech activities, they do not want their names or private information included in a file or database created or maintained by Defendants, and they do not want any of this information or data shared with private organizations such as SPLC, NAF, and ADL.

91. The DHS Assessment and RWE Policy have negatively affected CBR's ability to raise money through donations to support its anti-abortion speech activities.

92. The DHS Assessment and RWE Policy have negatively affected CBR's present effort to forge working relationships with mega-churches, which do not want to be associated with "extremist" groups of any sort.

93. The DHS assessment and the RWE Policy parrots terms used by political opponents to publicly attack CBR's reputation. Through the RWE Policy, DHS has made itself an echo chamber that gives resonance to political adversaries' attempts to silence conservative criticism of abortion.

94. Consistent with the DHS Assessment and the RWE Policy, political opponents have accused CBR of engaging in "hate speech." They have accused CBR employees and volunteers of being "anti-abortion radicals." They have accused CBR of being "terrorists," whose public display of abortion photographs is a "terror tactic." They have accused CBR and its employees and volunteers of being "fear mongers," who use "scare tactics" to inflame public sentiment. They have accused CBR of being "racist" for comparing abortion with slavery and

the lynching of African Americans. They have accused CBR of being "anti-Semitic" for comparing abortion with the Holocaust. And they have accused CBR and its members and volunteers of being "extremists."

95.     CBR members and volunteers have been subject to violence and threats of violence on account of their anti-abortion speech activities and political viewpoint on abortion. CBR's complaints to local and federal law enforcement agencies routinely result in no action on the part of law enforcement officials. Law enforcement agencies, most notably at the federal level, are slow to investigate these threats, and it is rare for those who threaten or attack CBR and its members and volunteers to be charged with a crime, even when CBR is able to establish the perpetrators' identities.

96.     By branding individuals and organizations such as Plaintiffs as "rightwing extremist," the DHS Assessment and the RWE Policy operate to create a hostile environment for Plaintiffs, resulting in an increase in threats of violence by those who oppose their political viewpoints.

**D.     Plaintiff Kevin Murray.**

97.     According to the DHS Assessment, Plaintiff Kevin Murray is a "disgruntled military veteran." Plaintiff Murray is publicly antagonistic toward the current administration and its stance on a range of issues, including immigration, taxation, restrictions on firearms ownership and use, abortion, and same-sex "marriage."

98.     Plaintiff Murray is also a plaintiff in another federal lawsuit that was filed against Treasury Secretary Timothy Geithner. That lawsuit, which has received much public attention,

seeks to enjoin the unconstitutional distribution to, and use of federal taxpayer funds by, American International Group, Inc. (AIG).

99. Pursuant to the RWE Policy, Plaintiff Murray is a "rightwing extremist," subjecting him to government scrutiny, investigation, surveillance, and intimidation.

100. As a result of the RWE Policy, Plaintiff Murray is deterred from attending, participating in, or associating with those who participate in TEA parties.

101. As a result of the RWE Policy, Plaintiff Murray is deterred from attending, participating in, or associating with those who engage in anti-abortion protests and activities, such as the activities of CBR.

102. Plaintiff Murray does not want to be part of a surveillance video or included in surveillance photographs for engaging in First Amendment speech activities, he does not want his name or private information included in a file or database created or maintained by Defendants, and he does not want any of this information or data shared with private organizations such as SPLC, NAF, and ADL.

103. Plaintiff Murray has recently sought federal employment. Consequently, the DHS Assessment and the RWE Policy deter him from associating with "rightwing extremists," such as CBR, for fear that he will be denied employment on account of his political views and political associations. To date, Plaintiff has been denied employment with the U.S. Border Patrol and with the U.S. Immigration and Customs Enforcement.

104. Plaintiff Murray is considering returning to active duty as a commissioned officer. However, the RWE Policy makes it more difficult for those branded as "rightwing extremists" to obtain federal employment or to join or remain in the military.

**E. Unconstitutional Purposes & Effects of the RWE Policy.**

105. The purposes and effects of the RWE Policy are to silence political opposition to the policies of the current administration, to marginalize political opponents by officially and pejoratively labeling them as "rightwing extremists," to deter and diminish support for political opponents, and to provide a DHS-sanctioned justification for government officials, including law enforcement officials, to harass political opponents, thereby creating a deterrent effect on political speech and expressive association.

106. The federal government's RWE Policy brands individuals and groups such as Plaintiffs as criminals on account of their political viewpoints, subjecting them to governmental scrutiny, investigation, surveillance, and intimidation, which has a deterrent effect on their activities and their rights to freedom of speech and expressive association.

107. The RWE Policy is a governmental attack on the reputations of Plaintiffs that is designed to marginalize them and their opposition to the policies and practices of the federal government, particularly including their opposition to the policies and practices of the current administration.

108. The RWE Policy deters donors and volunteers from supporting the activities of CBR. The RWE Policy deters universities and student groups from inviting CBR and its GAP display to their campuses. And the RWE Policy deters groups, such as mega-churches, from associating with CBR. Consequently, the RWE Policy harms CBR's ability to influence public opinion on the issue of abortion.

109. The RWE Policy results in the improper sharing of private information and data about "rightwing extremists," such as Plaintiffs, with certain private organizations that are political adversaries.

110. The RWE Policy authorizes the covert videotaping and photographing of "rightwing extremists," such as Plaintiffs, engaging in First Amendment speech activity.

111. The RWE Policy authorizes federal officials to create and maintain files and databases containing information and data about "rightwing extremists," such as Plaintiffs. And it authorizes the sharing of this information and data with certain private organizations, such as SPLC, NAF, and ADL.

112. The creation, adoption, and implementation of the RWE Policy has caused irreparable harm to Plaintiffs.

## FIRST CLAIM FOR RELIEF

### (First Amendment—Freedom of Speech)

113. Plaintiffs hereby incorporate by reference all above-stated paragraphs.

114. By reason of the aforementioned RWE Policy, which was created, adopted, and enforced under the color of federal law and authority, Defendants have deterred the exercise of Plaintiffs' right to freedom of speech in violation of the First Amendment to the United States Constitution.

115. As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief.

## SECOND CLAIM FOR RELIEF

### (First Amendment—Expressive Association)

116. Plaintiffs hereby incorporate by reference all above-stated paragraphs.

117. By reason of the aforementioned RWE Policy, which was created, adopted, and enforced under the color of federal law and authority, Defendants have deterred the exercise of Plaintiffs' right to expressive association in violation of the First Amendment to the United States Constitution.

118. As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief.

## THIRD CLAIM FOR RELIEF

### (Fifth Amendment—Equal Protection)

119. Plaintiffs hereby incorporate by reference all above-stated paragraphs.

120. By reason of the aforementioned RWE Policy, which was created, adopted, and enforced under the color of federal law and authority, Defendants have deprived Plaintiffs of the equal protection of the law guaranteed under the Fifth Amendment to the United States Constitution by targeting Plaintiffs for disfavored treatment on account of Plaintiffs' viewpoint on certain political issues.

121. As a direct and proximate result of Defendants' violation of the Fifth Amendment, Plaintiffs have suffered irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs ask this Court:

A)    to declare that Defendants' RWE Policy violates the First and Fifth Amendments to the United States Constitution as set forth in this First Amended Complaint;

B)    to permanently enjoin the RWE Policy and its application to Plaintiffs' speech and activities as set forth in this First Amended Complaint;

C)    to order the disclosure of any files or databases containing information about Plaintiffs or Plaintiffs' activities as set forth in this First Amended Complaint;

D)    to permanently enjoin the creation or maintenance of files or databases containing information about Plaintiffs or Plaintiffs' activities as set forth in this First Amended Complaint;

E)    to permanently enjoin the disclosure of information or data about Plaintiffs or Plaintiffs' activities to private organizations such as SPLC, NAF, and ADL, as set forth in this First Amended Complaint;

F)    to award Plaintiffs their reasonable attorney fees, costs, and expenses pursuant to 28 U.S.C. § 2412 (the Equal Access to Justice Act), and other applicable law;

G)    to grant such other and further relief as this Court should find just and proper.

Respectfully submitted,

THOMAS MORE LAW CENTER

/s/ Robert J. Muise
Robert J. Muise, Esq. (P62849)